(No. 94-CC-2436– )

MYRA J. DURBIN, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Order filed May 23, 1000.*

JAMES W. ACKERMAN, for Claimant.

JIM E. RYAN, Attorney General (PHILLIP MCQUILLAN, Assistant Attorney General, of counsel), for Respondent.

## ORDER

PATCHETT, J.

This case arose as a result of a single car accident which occurred February 20, 1993, on Illinois Business Route 48 in the vicinity of Taylorville, Illinois. A van driven by the Claimant struck a pile of salt which had been deposited on the highway due to a lid falling off of a salt box on an Illinois Department of Transportation (Department) truck.

Thomas Wattelet, the driver of the truck, testified that he had been an employee of the Department for 22 years. On February 20, 1993, he was called out at approximately 6:30 p.m. because of freezing rain. He performed a "circle of safety" maintenance check around the truck and proceeded to salt the roads on a prescribed route. A "circle of safety" is when the driver walks around his truck, checks the main bolts, pins, locks, and observes the truck. The truck was a two and one-half to three ton truck with a salt box on the rear, and a plow on the front. The salt box on the rear had a lid that was secured by pins which slipped in and snapped down to lock the lid in place. Mr. Wattelet testified that when he conducted the

circle of safety, he shook the lid to make certain the pins were in and it was locked securely in place.

Mr. Wattelet was driving approximately 15 to 20 mph and was salting the roads which, at the time, were icy with a little snow. Mr. Wattelet's route was approximately 40 to 50 miles long, and took one and one-half to two hours due to the weather conditions. Mr. Wattelet was near the end of his route when the lid fell off, approximately one and one-fourth to one and one-half miles from the depot. Mr. Wattelet testified he could not see the salt box while driving the truck.

Upon completing the first run, Mr. Wattelet returned to the depot at approximately 8:30 p.m. and noticed the lid was missing from the salt box. The lid in question was 72 inches long and 12 inches wide. Mr. Wattelet then back-tracked his route. After back-tracking a little over one mile, he found the lid in a pile of salt on the highway. Mr. Wattelet testified that the pile of salt was approximately 12 inches tall and 24 inches wide. Approximately eight to ten minutes had lapsed from the time he discovered the lid had fallen off the box to when he returned to the location of the salt spill. He then cleared the highway with his blade.

Carlyle Griffith testified that he was a temporary leave worker for the Department in February, 1993, and was Mr. Wattelet's supervisor that night. Mr. Griffith testified that, on the evening in question, he was in a pickup truck which belonged to the Department, and he heard Mr. Wattelet state over the radio that he had lost his salt lid. Mr. Griffith was nearby, so he checked the area and located the lid on the road. He was going approximately ten to 15 mph at the time because he was looking for the lid. He testified that the pile of salt was across an entire lane of traffic. The lid was located on the edge of the

road, with approximately one foot of it in the road and the rest in the ditch.

Mr. Griffith testified that the circle of safety is performed twice a night, but that most drivers would check every time they get a load of salt. If there is a heavy snowfall, the drivers will check in the middle of their route for snow covering their lights. This was not the case on the night in question. Mr. Griffith further testified that a lid has four pins holding it in place. He had a lid fall off his truck on one occasion, but it was when he had left the box down while moving from one part of the lot to another. His salt box was not in the upright position with the pins in. He had never had a lid fall off when it was in the upright position with the pins fastened as Mr. Wattelet's had been on the night in question. He further testified that he was not aware of any other times that lids had fallen off of salt boxes other than the two he testified about. Mr. Griffith, however, stated that sometimes a pin would shake loose on a truck and the driver would just put it back when he observed it during a circle of safety check.

Claimant's 12-year-old daughter, Crystal Durbin, was a passenger in the van on the night of the accident in question. Crystal testified that they hit something hard and the van bounced back and then it went forward over what they had hit and then went across the other lane of traffic and landed in the ditch. She testified that at the time of the accident it was dark and sleeting. She testified that Claimant was able to back the van out of the ditch. Crystal testified that Claimant's right shoulder, neck and arm were hurting the night of the accident causing the Claimant to use a heating pad over the weekend and to see a doctor on the following Monday. For approximately the next four months, Claimant appeared to be in frequent pain. Crystal testified that Claimant's ability to type has been limited,

and Claimant stopped going to school because she could not write or type for long periods of time. Crystal also testified that her mother had hurt her arm once when she worked at the factory in January of 1994.

Debra Buckles testified for the Claimant. She is a physical therapist at St. Vincent's Memorial Hospital. She met the Claimant in August of 1995 and evaluated her for physical therapy. The Claimant reported that her pain began on the previous Friday. Claimant told Ms. Buckles that she had been in a car accident three years before and the pain resembled the car accident pain, but she denied recent injury. Claimant did not relate the injury at the factory. Ms. Buckles testified that Claimant's main problem appeared to be muscular. A treatment was performed in accordance with a prescription from the doctor, which was for a seven-day course of treatment involving interferential stimulus, ultrasound massage and exercises.

Robert Torres testified that he and the Claimant lived together and, in April of 1991, opened a restaurant business together. Mr. Torres and Claimant were still operating the business when the accident occurred in February of 1993. Claimant did not return to work at the restaurant following the accident and they had to hire someone to do her work. The restaurant closed in October of 1993. Mr. Torres also confirmed that the Claimant experienced severe pain for approximately four months after the accident and continued to have pain after that period of time.

Claimant testified that, on the night in question, she left home at approximately 8:00 p.m. to go to a video store. The weather began to produce sleet through which she was driving approximately 30 to 40 mph. Claimant stated that she had observed the salt truck on Route 48 and the salt on the road. Claimant testified that, as she

was traveling down Route 48, she hit something and her van ended up on the other side of the road in the ditch. She stated that she did not see the pile of salt prior to striking it with her vehicle. Claimant next proceeded to back her vehicle out of the ditch and discovered that her shoulder was in pain. Claimant walked to the location where the salt was across the road and observed another car driving through the salt. Claimant testified that height of the salt was varied from two feet high at parts and only one foot high at others. Claimant did not see the lid that had fallen off of the salt truck.

Claimant further testified that the road where the salt was located was straight prior to the salt pile and began to curve after the location where she encountered the salt. There were no hills and the road was not well lit.

After the accident Claimant first proceeded to the police department and next to the emergency room. Claimant testified that after she returned home her pain got worse and, as such, she went to her doctor on the following Monday. For approximately one month she could not move easily without help. Claimant never returned to work at the restaurant, because it caused her pain to work as a waitress or dishwasher. Claimant then took a job with Eckland Hydraulics around October of 1993. Claimant testified that she worked at Eckland until January of 1994, when she quit because she had injured her wrist while on the job. Claimant also went to the emergency room for this injury. Claimant presented various medical bills totaling $4,879.05.

Dr. John Kain testified by evidence deposition. He is a doctor of chiropractic and Claimant was his patient. Dr. Kain first saw Claimant in his office on February 24, 1993. Claimant advised Dr. Kain of the accident and stated that she had immediate neck and middle back

pain. Dr. Kain diagnosed Claimant's injury as a hyper flexion/hyper extension type injury. Dr. Kain further observed spasm, tenderness and pain bilaterally in the cervical region, the cervical thoracic junction, shoulder region and middle back. X-rays were taken which were negative for any fractures, but according to Dr. Kain, the x-ray did show a loss of normal cervical lordotic curve. Dr. Kain testified that this is consistent with the Claimant's type of injury. A further x-ray on May 20, 1996, showed the cervical lordotic curve remained reduced. In June of 1993, Claimant had shown improvement in her flexation. By October of 1993, the Claimant was reporting considerable relief of her symptoms. She had treated with Dr. Kain regularly during the period of time from the accident to October 18, 1993.

Dr. Kain again treated Claimant on January 25, 1995, when she complained of neck pain and middle back pain. Claimant stated that work at the factory assembly line aggravated those symptoms. Dr. Kain testified that, at that point, her cervical motion was normal and orthopedic tests were negative. Dr. Kain observed a cervical muscle tension on Claimant's right side.

Dr. Kain saw Claimant again on May 2, 1996, when Claimant complained of constant pain. Dr. Kain referred Claimant to Dr. Lyle Wacaser.

Dr. Kain testified that the Claimant's head and neck complaints are related to the accident in February of 1993. Dr. Kain stated that it was difficult to determine whether Claimant's problem with her right arm was solely related to the accident on Route 48, in view of the additional trauma which occurred to her arm at the factory. Dr. Kain testified that the Claimant would be permanently predisposed to episodes of an intermittent basis of neck pain, headaches and tension throughout the shoulder region.

Claimant has presented this case as one of *res ipsa loquitur*, a doctrine of law whose purpose is to allow proof of negligence by circumstantial evidence when the direct evidence concerning the cause of the injury is primarily within the knowledge and control of the defendant. (*Kylavos v. Polichrones* (1942), 316 Ill. App. 444, 45 N.E.2d 99.) It applies when something that caused the injury is shown to be under the control or management of the party charged with negligence and the occurrence is one that, in the ordinary course of things, would not have happened if the person so charged had used proper care. The accident itself affords reasonable evidence, in the absence of explanation by the party that is charged, that it arose for want of proper care. See *Metz v. Central Illinois Electric and Gas Company* (1965), 32 Ill. 2d 446, 207 N.E.2d 305, citing *Feldman v. Chicago Railway Companies* (1919), 289 Ill. 25, 124 N.E. 334.

Like any other proof, it may be explained or rebutted by the opposing party. There was formerly a conflict in Illinois about whether the presumption or inference of negligence raised by the doctrine of *res ipsa loquitur* vanished entirely when any evidence appeared to the contrary. In *Metz*, the Court held that the better view was that the inference or presumption does not simply vanish or disappear when contrary evidence appears, but remains to be considered with all the other evidence in the case and must be weighed by the trier of fact against the direct evidence offered by the party charged.

While the doctrine of *res ipsa loquitur* does not excuse plaintiffs from the responsibility of exercising due care for their own safety, the doctrine does apply when the accident is of the kind which does not ordinarily occur without someone's negligence, and the instrumentality which caused the injury was within the management

and control of the defendant. (*Drewick v. Interstate Terminals, Inc.* (1969), 42 Ill. 2d 345, 247 N.E.2d 877.) In the case of *Dyvack v. Weber* (1986), 114 Ill.2d 232, 500 N.E.2d 8, 102 Ill. Dec. 386, the Supreme Court held that, subsequent to the courts adopting the doctrine of comparative negligence versus contributory negligence, a Claimant no longer need prove freedom from contributory negligence as an element of the *res ipsa loquitur* action. This is because such proof is not required in other negligence actions. Of course, the doctrine of comparative negligence would still apply once the doctrine was applied. The Court of Claims itself has a long history of applying the doctrine of *res ipsa loquitur.* In the case of *Kenney v. State* (1956), 22 Ill. Ct. Cl. 247, this Court made an award for wrongful death in a case in which a tree limb fell from a tree at the State fairgrounds. The Court there stated:

"Respondent has not offered any evidence, or explained why the limb fell, other than it did not know that the tree was in a dangerous and hazardous condition until after the accident. We are of the opinion that, from the testimony, the disease in the tree could have been determined had a proper inspection been made by the Respondent's agents. It was Respondent's duty to make such an inspection in order to safeguard the patrons at the Fair." *Kenney*, 22 Ill. Ct. Cl. 247.

In this case, the Respondent could argue that an inspection of the truck was conducted and that an inspection would not have shown that the lid was somehow improperly attached. However, this Court also made an award to the City of St. Louis in the case of *City of St. Louis v. State* (1964), 24 Ill. Ct. Cl. 477. In that case, a fighter jet belonging to the Illinois Air National Guard crashed at Lambert Field in St. Louis. As a result of the crash, the City of St. Louis had damage to its property. The airplane that caused the damage was under the sole management and control of the Respondent's agent, and it therefore was assumed that the accident would not

have happened if those who were in control of management had used proper care. A similar result was reached in the case of *Wiegers v. State* (1988), 40 Ill. Ct. Cl. 88, in which an award was made for damage for personal injury and property damage as a result of brakes failing on a State road grader. It is interesting to note that, in the *City of St. Louis* case and the *Wiegers* case, the instrumentality which caused the injury failed after operating in an extensively normal manner for a period of time. Neither the plaintiff nor the State could explain why the sudden failure occurred. Yet this Court held that it was a sufficient basis for liability.

Respondent cites the case of *Rutledge v. Board of Governors* (1991), 44 Ill. Ct. Cl. 257, in which an award was denied because of the failure to prove negligence. The issue in that case was the failure of evidence being presented on the issue of causation. In other words, the Claimant failed to meet his burden of proof that the injury, in fact, was caused by the failure of, or the instrumentality controlled by, the State. No such question exists in the present case, nor was it present in the *Wiegers* or the *City of St. Louis* cases cited above. For all of these reasons, we find liability on the part of the State.

Now we reach the issue of damages. Claimant has presented total medical bills of almost $5,000. There is clear evidence of a period of pain and suffering and some disability for several months following the accident. However, there is also a subsequent industrial injury which causes difficulty in properly assessing damages. Based on the evidence before the Court, we award the Claimant the sum of $15,000 for her medical bills, pain and suffering, and permanent injury. We do not find there has been any proof of comparative fault.